# In the United States Court of Appeals for the Third Circuit

GREYSTONE MORTGAGE, INC., on behalf of themselves and all others similarly situated; FIRST FINANCIAL LENDING LLC, on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellees,*

*v.*

EQUIFAX WORKFORCE SOLUTIONS LLC; EQUIFAX INC.,
*Defendants-Appellants.*

*On Appeal from the United States District Court for the Eastern District of Pennsylvania, No. 2:24-cv-02260, Hon. John F. Murphy*

## BRIEF OF DEFENDANTS-APPELLANTS

EDWARD J. BENNETT
JONATHAN B. PITT
CHARLES L. MCCLOUD
 *Counsel of Record*
WILLIAMS & CONNOLLY LLP
 *680 Maine Avenue SW*
 *Washington, DC 20024*
 *(202) 434-5000*
 *lmccloud@wc.com*

# CORPORATE DISCLOSURE STATEMENT

Defendant Equifax Inc. is a publicly traded company, and it has no parent corporation. Based on Equifax Inc.'s review of a Form 13F-HR filed by the Vanguard Group, Inc. ("Vanguard") with the U.S. Securities and Exchange Commission on January 26, 2026, as of December 31, 2025, Vanguard holds at least 10% of Equifax Inc.'s outstanding stock. (On January 12, 2026, Vanguard reported an internal realignment that would result in its subsidiaries reporting their beneficial ownership separately from Vanguard. Equifax Inc. does not currently have access to the beneficial ownership reporting of all Vanguard subsidiaries.) Equifax Workforce Solutions LLC is a wholly-owned subsidiary of Equifax Information Services of Puerto Rico, LLC, which itself is a wholly-owned subsidiary of Equifax Inc.

Dated: May 18, 2026

*/s/ Charles L. McCloud*
CHARLES L. MCCLOUD

i

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT .........................................................5

ISSUES PRESENTED ............................................................................6

STATEMENT OF RELATED CASES AND PROCEEDINGS ................6

STATUTES ..............................................................................................7

STATEMENT OF THE CASE .................................................................7

    A.    Equifax's Verification Services .............................................7

    B.    Plaintiffs and Their Putative Class Action...........................9

    C.    Equifax Updates—And Plaintiffs Accept—E-Commerce Portal Terms...........................................................................11

    D.    Equifax Discovers Plaintiffs' Membership Agreements Accepting the Arbitration Provision......................................13

    E.    Equifax's Motion and the District Court's Order ................14

STANDARDS OF REVIEW.....................................................................16

SUMMARY OF ARGUMENT.................................................................16

ARGUMENT ...........................................................................................20

I.    By Incorporating the AAA Rules, the Parties' Agreements Delegated Arbitrability Questions—Including Waiver-by-Litigation—To an Arbitrator. .....................................................20

    A.    The AAA Rules Delegate to the Arbitrator the Question of Waiver...............................................................................20

    B.    The District Court Relied on Inapplicable Authority...................23

II.    The District Court Improperly Held that Equifax Waived Its Right To Arbitrate Plaintiffs' Claims........................................27

    A.    Equifax Did Not Intentionally Relinquish Its Right to Arbitrate.................................................................................28

    B.    The District Court Erred When It Found That Arbitration Rights Can Be Waived Before They Exist ................37

III.    The District Court Improperly Enjoined Enforcement of a Bilateral, Voluntary Membership Agreement Under FRCP 23(d) ......41

    A.    Rule 23(d) Does Not Empower District Courts To Void Private Contracts........................................................................43

    B.    The District Court Abused Its Discretion Under Rule 23(d) by Voiding Voluntary and Bilateral Arbitration Agreements........................................................................47

        1.    Plaintiffs Are Sophisticated and Counseled Parties...........49

2. Equifax Did Not Purposefully Target Plaintiffs..................51

3. Equifax Did Not Unilaterally Impose the Agreements ...............................................................57

4. Plaintiffs Were Not Coerced ................................................57

5. The Agreements Conspicuously Included an Unambiguous Arbitration Provision ....................................60

C. The District Court's Rule 23(d) Order Was Not Tailored ...........62

CONCLUSION.................................................................................................64

# TABLE OF AUTHORITIES

Page

## CASES

*Ackerberg v. Johnson*, 892 F.2d 1328 (8th Cir. 1989) ........................................37

*Alvarez v. Experian Info. Sols., Inc.*,
661 F. Supp. 3d 18 (E.D.N.Y. 2023),
*aff'd*, 2024 WL 3643269 (E.D.N.Y. Aug. 2, 2024) ........................................34

*AMG Cap. Mgm't, LLC v. FTC*, 593 U.S. 67 (2021) ........................................46

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) ........................................38, 44

*Avery v. TEKsystems, Inc.*, 165 F.4th 1219 (9th Cir. 2026) ........................................46, 48, 58

*Billingsley v. Citi Trends, Inc.*,
560 F. App'x 914 (11th Cir. 2014) ........................................51, 53, 58

*Burrell v. Crown Cent. Petroleum, Inc.*,
176 F.R.D. 239 (E.D. Tex. 1997) ........................................60

*Chassen v. Fid. Nat'l Fin., Inc.*, 836 F.3d 291 (3d Cir. 2016) ........................................26, 37, 39

*Chen-Oster v. Goldman, Sachs & Co.*,
449 F. Supp. 3d 216 (S.D.N.Y. 2020) ........................................*passim*

*Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*,
809 F.3d 746 (3d Cir. 2016) ........................................22, 23, 25

*Collins v. Diamond Pet Food Processors*,
2013 WL 1791926 (E.D. Cal. Apr. 26, 2013) ........................................24

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985) ........................................44

*Dunn Indus. Grp., Inc. v. City of Sugar Creek*,
112 S.W.3d 421 (Mo. 2003) ........................................21

*Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207 (3d Cir. 2007) ........................................20, 23

*Fox v. Saginaw County*, 35 F.4th 1042 (6th Cir. 2022) ........................................48

*Garcia-Alvarez v. Fogo De Chao Churrascaria (Pittsburgh) LLC*,
2021 WL 5804289 (E.D. Tex. Dec. 7, 2021) ........................................57

*GFS, II, LLC v. Carson*, 684 S.W.3d 170 (Mo. Ct. App. 2023) ........................................26, 27

*Gorgonzola v. Dir. U.S. Off. of Pers. Mgmt.*,
2023 WL 1478999 (3d Cir. Feb. 2, 2023) ........................................42

*Goza v. Multi-Purpose Civic Ctr. Facilities Bd.*,
2014 WL 3672128 (W.D. Ark. July 23, 2014) ........................................33

*Greystone Mortg., Inc. v. Equifax Workforce Sols. LLC*,
No. CV 24-2260, 2026 WL 447163 (E.D. Pa. Feb. 17, 2026) ........................................6

*Guifu Li v. A Perfect Day Franchise, Inc.*,
270 F.R.D. 509 (N.D. Cal. 2010) ........................................50

Cases—continued:

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981)........................16, 47, 60

*Hegazy v. Halal Guys, Inc.*, 2023 WL 8924092 (S.D.N.Y. Dec. 27, 2023).......62

*Housley v. Autohaus, L.L.C.*, 711 S.W.3d 554 (Mo. Ct. App. 2025)................34

*In re Cmty. Bank*, 418 F.3d 277 (3d Cir. 2005)........................16

*In re Currency Conversion Fee Antitrust Litigation,*
224 F.R.D. 555 (S.D.N.Y. 2004)........................52

*In re Sch. Asbestos Litig.*, 842 F.2d 671 (3d Cir. 1988) ..............41, 48

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,*
726 F.3d 403 (3d Cir. 2013) ........................16

*Jean-Baptiste v. Post Com. Real Est. LLC,*
2023 WL 5309902 (E.D. Pa. Aug. 17, 2023)........................36

*Jenifer v. Del. Solid Waste Auth.,*
1999 WL 117762 (D. Del. Feb. 25, 1999) ........................58

*Jimenez v. Menzies Aviation Inc,*
2015 WL 4914727 (N.D. Cal. Aug. 17, 2015)........................46

*Johnson v. Zerbst*, 304 U.S. 458 (1938)........................38

*Jones v. Waffle House, Inc.*, 866 F.3d 1257 (11th Cir. 2017) ......54, 56

*Kashkeesh v. Microsoft Corp.*, 679 F. Supp. 3d 731 (N.D. Ill. 2023)................30

*Lamps Plus, Inc. v. Varela*, 587 U.S. 176 (2019)........................25, 38

*Lopez v. GMT Auto Sales, Inc.*, 656 S.W.3d 315 (Mo. Ct. App. 2022).......26, 34

*Monroe v. Stake Ctr. Locating, LLC,*
2025 WL 941310 (E.D. Va. Mar. 27, 2025) ........................50

*Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022)........................*passim*

*NFL Players' Concussion Inj. Litig.*, 923 F.3d 96 (3d Cir. 2019) ..........62

*Nino v. Jewelry Exch., Inc.*, 609 F.3d 191 (3d Cir. 2010)........................16

*Nw. Nat'l Ins. Co. v. Donovan*, 916 F.2d 372 (7th Cir. 1990) ........................55

*OConner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593 (S.D.N.Y. 2020) .......47, 53

*O'Connor v. Uber Techs., Inc.,*
2013 WL 6407583 (N.D. Cal. Dec. 6, 2013) ........................50

*Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326 (3d Cir. 2014)........................26

*Ralph Oldsmobile, Inc. v. Gen. Motors Corp.,*
2001 WL 1035132 (S.D.N.Y. Sept. 7, 2001)........................63

*Reed Elsevier, Inc. v. Crockett*, 734 F.3d 594 (6th Cir. 2013) ........................25

*Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010) ........................38

*Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100 (3d Cir. 2020)......21, 22

Cases—continued:

*Salazar v. Driver Provider Phx. LLC,*
    532 F. Supp. 3d 832 (D. Ariz. 2021)............................................................51
*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
    559 U.S. 393 (2010)...............................................................................45
*Singh v. Uber Techs. Inc.*, 939 F.3d 210 (3d Cir. 2019) ......................................20
*Smith v. Experian Information Solutions, Inc.,*
    2023 WL 6057377 (D.N.J. Sept. 14, 2023) ....................................23, 36
*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010) ...............55
*Story v. Heartland Payment Sys., LLC,*
    461 F. Supp. 3d 1216 (M.D. Fla. 2020)....................................................49, 57
*Valli v. Avis Budget Grp., Inc.*, 162 F.4th 396 (3d Cir. 2025).................*passim*
*White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334 (3d Cir. 2023) ............*passim*
*Williams v. Securitas Sec. Servs. USA, Inc.,*
    2011 WL 2713741 (E.D. Pa. July 13, 2011) ...............................................49

## STATUTES AND RULES

9 U.S.C.
    § 2..............................................................................................*passim*
    §§ 3-4 ....................................................................................................37
    § 16........................................................................................................5
Sherman Act, 15 U.S.C. §§ 1-2 ..........................................................................9
28 U.S.C.
    § 1292....................................................................................................5
    § 1331....................................................................................................5
    § 2072...............................................................................................19, 45
Rules Enabling Act................................................................19, 44, 45, 63
AAA, Commercial Arbitration Rules and Mediation Procedures,
    (Sept. 1, 2022), https://tinyurl.com/3xns489b
    Rule 1 ....................................................................................................24
    Rule 7 .............................................................................................21, 22
    Rule 9 ..................................................................................................22
    Rule 54 ..........................................................................................22, 24
Fed. R. Civ. P. 23 ...........................................................................*passim*
3d Cir. L.A.R. 28.1 ...............................................................................7

## OTHER AUTHORITIES

3 Newberg and Rubenstein on Class Actions § 9:2 & n.10 (6th ed., Dec. 2025 update)....................................................................43

13 Williston on Contracts § 39:19 (4th ed.) ........................................................39

## INTRODUCTION

Defendants Equifax Workforce Solutions LLC and Equifax Inc. ("Equifax") provide verifications of income or employment status to employers, lenders, governments, and others across the country. Equifax fulfills over 140 million verification requests each year, the vast majority of which are handled via invoiced relationships with frequent users. Equifax also sells a very small minority of its verifications to less frequent users via an online e-commerce portal ("E-Commerce Portal") where purchases are made by credit card.

Plaintiffs Greystone Mortgage, Inc., and First Financial Lending LLC ("Plaintiffs") are mortgage brokers who used the E-Commerce Portal. They sued Equifax in May 2024, alleging violations of federal antitrust law and seeking to represent a class of other Equifax customers. No class has been certified.

At the outset of litigation, Equifax investigated whether, in connection with using Equifax's services, Plaintiffs had entered into arbitration agreements. They had not. According to Equifax's records, Plaintiffs collectively had purchased just *three* verifications via Equifax's E-Commerce Portal in the years before filing suit (and none since 2023). And they did so at

a time when the terms of service, Equifax's Online Universal Membership Agreement ("Membership Agreement" or "Agreement"), did not include an arbitration provision. Moreover, Equifax had no reason to believe Plaintiffs— sporadic users (at best) who had just sued Equifax—would return to use Equifax's services, let alone that they would agree to new terms of service that included an arbitration provision. So Equifax did what any fair-minded litigant would do: It defended the putative class action.

Equifax also continued running its business. Several months after the complaint was filed, Equifax made routine updates to the terms of service for its E-Commerce Portal. Those updates included adding a clause requiring arbitration of all disputes with Equifax, present and future ("Arbitration Provision").

More than a year after the lawsuit was filed, in June 2025, while searching its files in response to an early discovery request, Equifax discovered that Plaintiffs *had* in fact consented to the updated terms in the Membership Agreement. In March and June of 2025 respectively, each Plaintiff logged back into Equifax's E-Commerce Portal, purchased additional verification services, and accepted the updated Membership Agreement.

Within forty-eight hours of discovering that Plaintiffs had signed the Membership Agreement, Equifax notified Plaintiffs and sought their consent to dismiss the complaint in favor of arbitration; when they refused, Equifax moved to compel arbitration in the district court.  Nevertheless, the district court denied the motion to compel on the theory that Equifax waived its future right to arbitrate by litigating *before* Plaintiffs consented to arbitration and *before* Equifax even knew that they did so.  The court also took the extraordinary step of enjoining the enforcement of Equifax's Membership Agreement across the entire putative class until Equifax could reissue its contracts with additional, court-ordered terms.

This Court should reverse for three reasons.

*First*, the parties' Membership Agreement plainly delegated gateway questions of arbitrability—including whether Equifax waived its right to arbitrate—to an arbitrator.  The district court reached a contrary conclusion only by misapplying a clear-statement rule disfavoring *classwide arbitration* to these *bilateral arbitration* agreements between individual parties.

*Second*, the district court's waiver analysis subverts the very concept of waiver.  It is axiomatic that a party cannot waive a right that it does not have.  But the district court treated Equifax's actions before Plaintiffs even agreed

to arbitrate as evidence of an intent not to arbitrate. No source of law supports that remarkable conclusion. Equifax could not have waived its right to arbitrate because its prior investigation into arbitrability was reasonable, and it moved to compel as soon as it knew of the Agreement.

*Third*, the district court's recourse to Rule 23(d) relief was legal error and an abuse of discretion. Rule 23(d) is a *procedural* rule; it does not (and cannot) permit district courts to enjoin the enforcement of arbitration agreements on *substantive* grounds that do not otherwise exist at law. Even if such an injunction were theoretically permissible, courts order Rule 23(d) relief only where defendants attempt to abuse the class action process through coercive or misleading communications. But Plaintiffs here are not vulnerable, were not targeted, and were not coerced. In fact, it was Plaintiffs, not Equifax, who initiated the communications at issue: After this litigation had begun, Plaintiffs unexpectedly ordered new services and signed the updated Membership Agreement, even though it very clearly advised potential customers that "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES."

4

In any event, even if *these* Plaintiffs could not be compelled to arbitrate, the district court had *no* basis to impose a wholesale invalidation of Equifax's contracts with thousands of other businesses who willingly accepted the updated terms and conditions, including the Arbitration Provision. The district court's decision would establish a *de facto* rule that any time a company finds itself the subject of a putative consumer class action lawsuit, it must refrain from using form contract terms that include an arbitration provision, irrespective of the provision's clear disclosure and even where no class has been certified. This Court should not endorse that novel and ungrounded proposition.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. Its order denying the motion to compel arbitration and enjoining enforcement of the Membership Agreement was issued on February 17, 2026. Appellants timely noticed an appeal on March 6, 2026.

This Court has jurisdiction over an appeal from the denial of a motion to compel arbitration, 9 U.S.C. § 16(a)(1), and from an order enjoining the Membership Agreement, *id.* § 16(a)(2); 28 U.S.C. § 1292(a)(1).

5

## ISSUES PRESENTED

1. Whether an arbitration agreement that expressly incorporates the AAA Commercial Arbitration Rules and those Rules' provisions governing waiver delegates to the arbitrator the authority to decide whether a party has waived its right to arbitration. JA18-21.

2. Assuming the court and not the arbitrator could decide the waiver question, whether appellants waived their right to arbitrate a dispute by participating in litigation before Plaintiffs had signed any agreement to arbitrate, and before appellants knew or reasonably should have known that Plaintiffs had entered into applicable arbitration agreements. JA21-27.

3. Whether Federal Rule of Civil Procedure 23(d) authorizes a district court to enjoin the enforcement of otherwise lawful arbitration agreements (including as to parties not before the court), and, even if so, whether the district court abused its discretion in ordering such relief here. JA27-37.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This appeal arises from the district court's memorandum opinion and order denying appellants' motion to compel arbitration and granting in part appellees' motion to enjoin enforcement of the Membership Agreement. *Greystone Mortg., Inc. v. Equifax Workforce Sols. LLC*, No. CV 24-2260, 2026 WL 447163 (E.D. Pa. Feb. 17, 2026).

This case has not previously been before this Court, and appellants are aware of no other related case or proceeding that is completed, pending, or about to be presented before this Court or any other court or agency, state or federal. *See* 3d Cir. L.A.R. 28.1(2).

## STATUTES

Pertinent statutes are reproduced in an addendum to this brief.

## STATEMENT OF THE CASE

### A.    Equifax's Verification Services

Equifax sells services to users who wish to verify an individual's income and employment for certain legitimate business purposes. JA759. For example, mortgage companies may use Equifax's verification services before extending a mortgage loan. *See* JA68. Equifax fulfills over 140 million verification requests each year. JA759.

The market for employment and income verification is diverse and competitive. For example, businesses and lenders can confirm income and employment information through Equifax's competitors: Experian, TransUnion, Truework, Truv, and Xactus (among many others). *See* JA142; JA782. Lenders can also obtain verifications directly from employers, including the many employers who have not contracted at all with Equifax or whose contracts with Equifax do not include any exclusivity requirement. *See*

JA60. And lenders can manually verify borrower information themselves, free of charge. *See* JA60.

There are also several ways to obtain Equifax's verification services. One method is to enter into an agreement with Equifax where Equifax invoices the customer for usage of Equifax's services on a monthly basis. Customers can negotiate bespoke terms this way. Those terms may or may not include dispute resolution procedures, which may or may not include requirements regarding arbitration. *See* JA774. Another way that companies use Equifax's services is through its "pay-as-you-go" E-Commerce Portal. In connection with using that service, customers must agree to a Membership Agreement. *See* JA9; JA761. Less than 1% of Equifax's verification business occurs through this E-Commerce Portal, and a majority of users who place pay-as-you-go orders via Equifax's E-Commerce Portal make just one or two purchases before their accounts are eventually deactivated due to inactivity, for security and compliance reasons. *See* JA759-60. Most customers who purchase more than that limited number of verifications choose to do so pursuant to separate bespoke agreements with Equifax rather than through the E-Commerce Portal. *See* JA759-60.

### B. Plaintiffs and Their Putative Class Action

Greystone and First Financial are mortgage companies that broker home loan transactions. Although they have operated for nearly seven and thirteen years, respectively, JA794-96, in the years leading up to their complaint each Plaintiff purchased verifications from Equifax on only one or two occasions before filing this suit. First Financial ordered a single verification in June 2023. *See* JA532. Greystone ordered two verifications on a single day in October 2023. JA532. Yet according to public data, Plaintiffs appear to have collectively originated dozens of mortgages in 2023 and 2024, for which they apparently obtained verifications of borrowers' income and employment information from sources other than Equifax. JA773-74; JA786-92.

After their initial purchases, Plaintiffs filed this lawsuit alleging they overpaid for verification services because of violations of the Sherman Act, 15 U.S.C. §§ 1-2. JA101-11. Plaintiffs also sought to pursue antitrust claims on behalf of a putative class of all purchasers of Equifax verification services after May 28, 2020, excluding only Equifax itself and federal government entities. JA98-99.

Two days after Plaintiffs filed their complaint, Equifax began investigating Plaintiffs' claims, conducting due diligence into whether Plaintiffs had arbitration agreements with Equifax. JA760. They did not. At the time of Plaintiffs' pre-suit purchases, Equifax's Membership Agreement did not include an arbitration provision. JA530. And Equifax had no reason to believe that Plaintiffs would enter into future arbitration agreements because, as discussed, Plaintiffs fit the mold of the typical pay-as-you-go customer that makes only one or two purchases before their accounts deactivate for security and compliance reasons. JA760.

With no basis to seek arbitration, Equifax proceeded with the litigation on a normal schedule. On August 9, 2024, Equifax filed a motion to dismiss. JA133. The Court denied that motion in February 2025. JA296. Equifax filed an answer on March 4. JA304. The parties began to engage in discovery, including by serving discovery requests on one another and serving document subpoenas on third parties. JA605. But no depositions have been noticed or taken. JA605. Plaintiffs also did not produce any documents until July 24, 2025 (three days after Equifax notified the district court of its imminent motion to compel), when Plaintiffs sent Equifax's counsel their first production totaling sixty pages. JA605; *see also* JA500.

### C. Equifax Updates—And Plaintiffs Accept—E-Commerce Portal Terms

Equifax periodically updates its Membership Agreement and has done so at least two times within the past three years. *See* JA530. Several months after Plaintiffs filed their complaint, Equifax made another such revision to its terms of service, this time adding a binding Arbitration Provision. JA529-30. The provision was presented to customers entering Equifax's E-Commerce Portal on or after August 13, 2024. JA529.

While this case was ongoing (and after Equifax filed its answer), representatives of both Plaintiffs visited Equifax's E-Commerce Portal to purchase verification services. JA529-30. As part of their purchases, Plaintiffs reviewed, acknowledged, and agreed to the revised Membership Agreement that included a binding Arbitration Provision. JA529-30. First Financial's Principal, Robert Salotto, entered into an Agreement on March 12, 2025, and ordered verification services on March 13 and March 19, 2025; Greystone's President, Marc D'Ambrosio, entered into an Agreement on June 3, 2025, and ordered verification services the same day. JA529; JA532.

The Agreement Plaintiffs accepted in March and June 2025 stated in capital letters at both the top and bottom: "THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE

ENFORCED BY THE PARTIES." JA534; JA538. That Arbitration Provision requires "binding arbitration" of "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof" by the American Arbitration Association ("AAA") in St. Louis, Missouri. JA538.

The Arbitration Provision applies to "[a]ny controversy or claim arising out of or relating to" the Membership Agreement, including past or pending controversies. JA538. In particular, each Agreement states: "This Agreement specifically *supersedes and replaces* any agreement between the parties that predates this Agreement … even if the prior agreement contains an 'entire agreement' or 'merger' clause, and any such agreements are terminated." JA534 (emphasis added). And each Agreement states that a user's acceptance indicates the user "is authorized to execute this Agreement" and that "this Agreement is a binding obligation of User and any person or company that User represents." JA538. To proceed with purchasing a verification, Plaintiffs first had to certify, "I have reviewed and agree to the above Terms and Conditions," and then had to click "Agree & Continue." JA552. Both Plaintiffs did so. JA529-30.

**D. Equifax Discovers Plaintiffs' Membership Agreements Accepting the Arbitration Provision**

On June 24, 2025, Equifax employees were instructed to assist in investigating the location of certain documents responsive to one of Plaintiffs' pending discovery requests. JA528.[1] Equifax employees had already gathered hundreds of thousands of pages of documents in response to Plaintiffs' discovery requests. D. Ct. Dkt. 114-1, at 8. This time, Equifax employees were instructed to collect documents reflecting E-Commerce Portal customers' agreement to Equifax's terms and conditions. JA528.

On July 14, 2025, upon reviewing the output of data compiled by those employees, Equifax discovered that in March and June of that year, both Plaintiffs had agreed to binding arbitration provisions via the E-Commerce Portal. JA529. Within two days of learning this fact, Equifax's counsel alerted Plaintiffs' counsel. JA628-29. Equifax's counsel requested that Plaintiffs agree to dismiss the complaint in favor of arbitration or, alternatively, to agree that discovery could proceed without constituting a waiver of any right to

---

[1] Plaintiffs requested production of "[d]ocuments sufficient to show all Agreement(s) … [y]ou have with a person for the purchase or provision of Your [verification-of-income-and-employment] product(s) or service(s)." JA620.

arbitrate. JA629. Plaintiffs refused to consent to any of these requests. JA606.[2]

### E. Equifax's Motion and the District Court's Order

On July 25—less than two weeks after discovering the Agreements—Equifax moved to compel arbitration and stay proceedings. JA523. Plaintiffs then filed a motion to enjoin enforcement of Equifax's Arbitration Provision and limit Equifax's communications with class members as to this litigation. JA647.

The district court denied Equifax's motion to compel arbitration on the papers. JA37-38. It agreed that Plaintiffs and Equifax "entered into an arbitration agreement." JA14. But it declined to determine the "scope" of the Arbitration Provision because, in its view, Equifax "waived the right to arbitrate." JA18. That Equifax promptly moved to compel arbitration after discovering the Agreements was immaterial—in the court's view, Equifax failed to preserve its "future" arbitration rights by failing to notify the court at the outset of litigation (before the arbitration agreement existed) that it

---

[2] As soon as Plaintiffs refused, Equifax moved to stay discovery pending its forthcoming motion to compel arbitration. JA500. The district court denied that motion without prejudice to allow Equifax to produce evidence of the parties' agreements, which Equifax then did. JA522.

intended to arbitrate. *See* JA21. The district court also reasoned that by participating in early discovery and motions practice between August 2024 and July 2025, Equifax "acted inconsistently with an intent to assert its right to arbitrate." JA22 (citation omitted); *see also* JA24-25. The court reached that conclusion even though for most of the relevant period, Equifax *had no such "right"* because Plaintiffs had not signed any arbitration agreements.

The court also granted in part Plaintiffs' motion to enjoin enforcement of Equifax's arbitration clause. JA37-38. Invoking its authority to set procedural rules for a class action under Rule 23(d), the court accused Equifax of "tactical[ly]" waiting to "seek arbitration until both named plaintiffs had accepted the updated Membership Agreement." JA29-31. And it concluded that Equifax's offer of verification subject to updated terms and conditions could mislead potential members of the putative class. JA33-34. On that basis, the court "enjoin[ed] the enforcement of the updated Membership Agreement under its present form, order[ed] Equifax to make a curative notice to those who have already accepted its terms, and order[ed] Equifax to revise its arbitration provision to appropriately apprise potential class members of this litigation." JA27-28.

Equifax filed a timely notice of appeal. JA1. The district court subsequently stayed proceedings in that court, including the deadline to comply with the court's Rule 23(d) order, pending resolution of this appeal. JA839.

## STANDARDS OF REVIEW

"[T]he applicability and scope of arbitration agreements" are "questions of law" over which this Court "exercise[s] plenary review." *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 200 (3d Cir. 2010) (citation omitted). This Court likewise reviews *de novo* whether a party "through its litigation conduct, waived its right to compel arbitration," while supporting factual findings are reviewed for clear error. *Id.* Finally, a district court's interpretation of the Federal Rules of Civil Procedure is reviewed *de novo*, *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 726 F.3d 403, 408 (3d Cir. 2013), and an order granting relief under Rule 23(d) is reviewed for abuse of discretion, *In re Cmty. Bank*, 418 F.3d 277, 310 (3d Cir. 2005) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)).

## SUMMARY OF ARGUMENT

I.    The district court should not have decided whether Equifax waived its right to arbitrate because the parties clearly and unmistakably

delegated that threshold issue to the arbitrator. The parties incorporated the AAA Commercial Arbitration Rules into their Agreements. This Court has held that incorporating the AAA Rules is a clear delegation of arbitrability questions. The AAA Rules also specifically empower the arbitrator to decide whether a party has waived the right to arbitrate by litigation conduct. That is further evidence that the parties clearly reserved waiver questions for the arbitrator.

II.    On the merits, the district court invented a new test that reached the wrong result. Waiver considers whether one "intentional[ly] relinquish[es] or abandon[s] … a known right." *Valli v. Avis Budget Grp., Inc.*, 162 F.4th 396, 405 (3d Cir. 2025) (citation omitted). Equifax did neither of those things. Two days after discovering Plaintiffs' Agreements, Equifax informed Plaintiffs that it intended to seek arbitration. Equifax then moved to compel arbitration less than two weeks later. Equifax thus acted to preserve its rights as soon as it knew those rights existed.

In limited circumstances, courts will impute knowledge of an agreement where a right-holder strategically ignores evidence of arbitrability. But Equifax did no such thing. At the start of the case, Equifax immediately dug into Plaintiffs' transaction history and learned that neither had agreed to

17

arbitration.  Moreover, Plaintiffs' minimal transaction history suggested they were unlikely to make future purchases that might trigger an updated agreement.  Given the information Equifax gained from its diligent investigation, its discovery of the later-initiated Agreements within four months was reasonable.  But even if Equifax were automatically imputed with knowledge of its Agreements with Plaintiffs from the moment of formation, Equifax did not intentionally relinquish its rights by engaging in the early stages of discovery.

Instead of considering whether Equifax preserved its "known" rights, the district court concluded that Equifax failed to preserve "future" arbitration rights that did not yet exist.  It reached this result by starting the waiver clock when Equifax updated the Membership Agreement, before either Plaintiff had agreed to arbitrate.  This result violates fundamental waiver and contract principles:  A party cannot waive a right before it exists.

III.  The district court improperly relied on Rule 23(d) to wholly invalidate the parties' voluntary agreements.  Rule 23(d) grants district courts the power to resolve "procedural" matters so that they may "conduct[]" class actions. Fed. R. Civ. P. 23(d)(1).  It does not give district courts any standalone authority to order *substantive* relief of the kind the district court imposed

18

here. For similar reasons, reading Rule 23(d) to authorize the injunctions here would violate the Rules Enabling Act because the district court used a non-procedural order to directly abrogate "substantive" contract rights. 28 U.S.C. § 2072(b).

Even if Rule 23(d) could theoretically support invalidating private contracts, that extraordinary power is limited to situations where a party abuses the class action process through deceptive or coercive communications. This is no such case. Plaintiffs—two sophisticated mortgage companies—initiated transactions where they voluntarily agreed to a clear and conspicuous Arbitration Provision that Equifax implemented in the ordinary course of business. None of the hallmarks of coercion or deception that could warrant invalidating private contracts are present here.

Finally, the district court's order was overbroad. Rule 23 remedial orders must be the narrowest possible relief necessary to remedy any injury. And a wholesale invalidation of thousands of agreements was not warranted when a curative notice and opportunity to opt out would have accomplished the same ends.

# ARGUMENT

**I. By Incorporating the AAA Rules, the Parties' Agreements Delegated Arbitrability Questions—Including Waiver-by-Litigation—To an Arbitrator**

As a threshold matter, the district court never should have determined whether Equifax waived its right to arbitrate because the Agreement clearly delegates that question to the arbitrator.

"[W]hether a party has waived its right to arbitrate by actively litigating the case in court" is a question of "arbitrability"—that is, a question of whether the parties' dispute can be arbitrated. *Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 216-18 (3d Cir. 2007) (citation omitted). Although courts decide arbitrability questions by default, parties can "contract around" that baseline and delegate to an arbitrator "gateway question[s] of arbitrability." *Singh v. Uber Techs. Inc.*, 939 F.3d 210, 215 (3d Cir. 2019). The Agreement here clearly and unmistakably delegated arbitrability questions to the arbitrator by incorporating the AAA Rules, including the Rules' provisions governing waiver-by-litigation.

**A. The AAA Rules Delegate to the Arbitrator the Question of Waiver**

The Agreement expressly states "[a]ny controversy or claim arising out of or relating to this Agreement … shall be settled by binding arbitration …

20

administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules." JA538. Under Missouri law (which governs the Agreement), "matters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in haec verba." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 435 n.5 (Mo. 2003). So the AAA Rules must be treated as if they were a part of the Agreement.

The AAA Rules, in turn, unambiguously delegate arbitrability questions to the arbitrator. The AAA's "Jurisdiction" rule provides that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." AAA, Commercial Arbitration Rules and Mediation Procedures, Rule 7(a) (Sept. 1, 2022), https://tinyurl.com/3xns489b ("AAA Rules"). Thus, this Court has recognized that "incorporation of the AAA rules constitutes 'clear and unmistakable' evidence of the parties' intent to delegate arbitrability." *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 104 (3d Cir. 2020) (cleaned up). Indeed, the AAA Rules provision on arbitrability "is about as 'clear and unmistakable' as language can get." *Id.* at 103 (citation omitted). Unsurprisingly, then, "virtually every circuit to have considered the

21

issue has determined that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763 (3d Cir. 2016) (cleaned up) (collecting cases).

But the AAA Rules go further—not only do they unmistakably delegate "gateway" questions of arbitrability, they specifically contemplate that arbitrators will resolve the question of whether a party's litigation conduct waived its right to arbitrate. As relevant here, Rule 54(a) states that "[n]o judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate." And Rule 9 provides that the "arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties." Read together, Rules 7(a), 9, and 54(a) provide that an arbitrator—not a court—"shall have the power to rule on" and "interpret and apply" a rule that conducting a "judicial proceeding" shall not "be deemed a waiver." That is clear and unmistakable evidence that the parties delegated to the arbitrator not just general authority over arbitrability questions, but the specific authority to resolve the arbitrability question here—whether Equifax's litigation conduct amounts to waiver.

## B. The District Court Relied on Inapplicable Authority

None of the district court's justifications for refusing to enforce the delegation clause withstands scrutiny.

1. The district court relied first on *Ehleiter*, where this Court held that generic language in an arbitration agreement did not clearly delegate waiver questions to the arbitrator. 482 F.3d at 222. *Ehleiter* does not apply. There, unlike here, not only did the disputed arbitration provision not incorporate the AAA Rules, it included "no references" to waiver whatsoever. *Id.* It said only that "[a]rbitrable matters include … the issue of arbitrability of any claim or dispute." *Id.* at 221-22 (emphasis removed). In this case, however, the Agreement incorporates the AAA Rules, which in turn expressly govern waiver. This is sufficient to "manifest a contrary intent" to the general presumption that courts will determine whether a party has waived the right to arbitration. *Cf. id.* at 222. Again, every circuit to consider the issue agrees that incorporation of the AAA Rules evinces "unmistakable" intent to "arbitrate arbitrability." *Chesapeake*, 809 F.3d at 763 (citation omitted).

The district court also cited the unpublished decision in *Smith v. Experian Information Solutions, Inc.*, 2023 WL 6057377, at *4 (D.N.J. Sept. 14, 2023), for the proposition that the AAA Rules do not apply to litigation

23

conduct at all, JA20 n.10.  But *Smith*'s quotation of the AAA Rules omits key context.  In its entirety, the provision relied on by *Smith* reads, "[t]hese Rules and any amendment to them shall apply *in the form in effect* at the time the administrative requirements are met for a Demand for Arbitration."  AAA Rules, Rule 1(a) (emphasis added).  The emphasized language, omitted by *Smith*, reveals that the provision simply identifies "which version of the AAA rules apply," *see Collins v. Diamond Pet Food Processors*, 2013 WL 1791926, at *6 (E.D. Cal. Apr. 26, 2013); it does not exclude the application of the AAA Rules to prior litigation conduct.  Indeed, as explained above, the provision could not possibly exclude litigation conduct from the Rules' scope, because Rule 54(a) governs waiver through litigation.  *See* AAA Rules, Rule 54(a).

2.     The district court acknowledged that "the Third Circuit has said that incorporation by reference of the AAA Rules may suffice as clear and unmistakable evidence of an intent to arbitrate a bilateral dispute."  JA19. Nevertheless, it claimed the "bilateral arbitration" cases (holding that incorporating the AAA Rules amounts to delegation) were "entitled to relatively little weight in the class arbitrability context," which the court claimed implicates special concerns.  JA19 (cleaned up).

24

That conclusion rests on a fundamental misunderstanding: "Class arbitration," as used in the cases cited by the district court, refers to whether a dispute can proceed in arbitration on *a class basis*, rather than through individualized arbitrations. As this Court and others have recognized, "arbitration is poorly suited to the higher stakes of class litigation" and "classwide arbitration is not arbitration as envisioned by the FAA." *Chesapeake*, 809 F.3d at 764 (cleaned up). Because of the "fundamental difference between class arbitration and the individualized form of arbitration envisioned by the FAA," courts "may not infer consent to participate in class arbitration absent an affirmative contractual basis for concluding that the party *agreed* to do so." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184-85 (2019) (cleaned up). For the same reasons, courts have repeatedly rejected efforts by plaintiffs to compel class arbitration over the objection of defendants, absent clear and unmistakable evidence that the parties agreed to class arbitration. *See, e.g.*, *id.*; *Reed Elsevier, Inc. v. Crockett*, 734 F.3d 594, 598-99 (6th Cir. 2013).

This case does not implicate the same concerns. To begin with, this case is not about whether Plaintiffs can compel a particular kind of arbitration. Plaintiffs are instead attempting to *evade* their obligation to arbitrate in favor

of a putative class action in district court.  Similarly, the delegation issue here has nothing to do with class arbitrability—the question is simply whether bilateral contracts between each Plaintiff and Equifax delegate waiver questions to the arbitrator.  And although Plaintiffs hope to represent a class in the district court, no class has been certified, and arbitration between Equifax and Plaintiffs would be one-on-one.  That is "arbitration as envisioned by the FAA." *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 334 (3d Cir. 2014) (citation omitted) (emphasis omitted).  Indeed, this Court has compelled bilateral arbitration even when plaintiffs brought a putative class action in district court, because "the right to individual arbitration is a distinct right separate from the right to class arbitration." *Chassen v. Fid. Nat'l Fin., Inc.*, 836 F.3d 291, 299 (3d Cir. 2016) (abrogated in part on other grounds).  It should do the same here.

3.      Finally, the district court cited in passing Missouri cases that have declined to refer the question of waiver to the arbitrator even in instances where the parties agreed to arbitrate arbitrability.  JA19 n.9 (citing *GFS, II, LLC v. Carson*, 684 S.W.3d 170, 184 (Mo. Ct. App. 2023); *Lopez v. GMT Auto Sales, Inc.*, 656 S.W.3d 315, 327-28 (Mo. Ct. App. 2022)).  Those courts read the Supreme Court's decision in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022),

26

to indicate that whether a party has waived their right to arbitrate is a procedural question for the court to resolve. *See, e.g.*, *GFS*, 684 S.W.3d at 179. In fact, *Morgan*'s holding was simply that prejudice is not a requirement to find that a party's litigation conduct waived its rights under the FAA. *Morgan*, 596 U.S. at 418-19. It did not opine on the test for concluding when a contract has delegated the question. In any event, the Missouri cases cited by the district court stand only for the proposition that claims of waiver-by-litigation may be decided by a court where the arbitration agreement "generally submits issues of 'enforceability' or 'arbitrability' to the arbitrator." *GFS*, 684 S.W.3d at 184. As explained above, *supra* pp.20-22, the Membership Agreement here is not general at all, but instead, through the AAA Rules, specifically addresses the question of waiver-by-litigation and gives authority over that issue to the arbitrator.

## II. The District Court Improperly Held that Equifax Waived Its Right To Arbitrate Plaintiffs' Claims

Even assuming the district court, and not the arbitrator, could decide the issue of waiver, the court was wrong to conclude that Equifax waived its right to arbitrate. Equifax acted consistently with an intention to arbitrate by immediately investigating Plaintiffs' claims, uncovering their new Agreements within a reasonable time, and taking steps to compel arbitration just days

thereafter. The district court reasoned that although Plaintiffs did not agree to arbitrate until March and June of 2025, Equifax's decision to litigate before that point waived any "future" rights to arbitrate. *See* JA21-27. But that ignores the simple fact that before Plaintiffs agreed to the updated Membership Agreement, Equifax had no choice but to litigate, because it had no ability to compel arbitration. The district court's analysis is irreconcilable with the well-established principle that a defendant cannot knowingly waive rights that do not yet exist.

### A. Equifax Did Not Intentionally Relinquish Its Right to Arbitrate

Like any other right, the right to arbitrate can be waived. But whether a party has waived the right to arbitrate does not depend on an individual district court's sense of fairness. Waiver can only be found when a party "intentional[ly] relinquish[es] or abandon[s] … a known right." *Valli*, 162 F.4th at 405 (quoting *Morgan*, 596 U.S. at 417). To find waiver, therefore, a court must satisfy two requirements: The knowledge prong, which encompasses both "known" rights and rights that one "should have known" about under the circumstances, *see White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334, 340-41 (3d Cir. 2023), and the "intentional relinquishment" prong, which considers whether the right-holder's litigation conduct "evince[s] a

preference for litigation over arbitration," *see id.* at 340 (citation omitted). Together, they ask whether a party disclaimed its rights by failing to take reasonable steps to uncover and preserve them. And under both prongs, it was legal error for the district court to conclude that Equifax waived its rights.

1. Start with the issue of timing. Equifax moved to compel arbitration as soon as it learned of Plaintiffs' binding Membership Agreements with the Arbitration Provision. On July 14, 2025, Equifax discovered Plaintiffs' Agreements, JA529, and it relayed that information to Equifax's counsel the next day, JA606. The day after that, on July 16, 2025, Equifax asked Plaintiffs' counsel (1) whether their clients would dismiss the complaint in accordance with the parties' Agreements, or (2) whether Plaintiffs would at least agree that Equifax's participation in discovery going forward would not be deemed a waiver. JA627-29. After Plaintiffs refused each of those requests, Equifax notified the district court of its then-forthcoming motion on July 21, 2025, JA500-04, which it filed four days later on July 25, 2025, JA523-24. So eleven days after Equifax learned that Plaintiffs had agreed to arbitrate their claims, its motion to compel arbitration was on file with the district court. Equifax did not sleep on any "known" rights.

Finding waiver here is legal error because Equifax's swift action belies any notion that it preferred litigation to arbitration. "Once [Equifax] learned of its potential right to arbitrate, [it] promptly informed the court and plaintiffs, and then quickly moved to compel arbitration." *Kashkeesh v. Microsoft Corp.*, 679 F. Supp. 3d 731, 739 (N.D. Ill. 2023).

Moreover, even prior to acquiring actual knowledge of the Agreements, Equifax reasonably attempted to determine whether Plaintiffs had agreed to arbitrate. In limited cases, the law permits the imputation of knowledge of an arbitration agreement when a party failed to take reasonable steps to uncover it—that is, the right-holder "should have" known about the existence of enforceable agreements because it was obvious from even a cursory review of the facts. *See White*, 61 F.4th at 340-41. The aim of that rule is to prevent parties from tactically avoiding knowledge of an arbitration agreement and asserting it "[o]nly after it was apparent that further litigation would be required" and unfavorable. *See id.* at 340.

The circumstances in *White* are illustrative. There, this Court found that defendant Samsung should have known about its arbitration rights because "from the outset of litigation" it was obvious that some plaintiffs had entered into enforceable arbitration agreements. *Id.* All plaintiffs had

30

purchased SmartTVs from Samsung and agreed to associated terms and conditions, some of which included arbitration provisions. *Id.* at 336-37. Thus, "Samsung was on notice that plaintiffs' claims could be arbitrable"—the only question was which terms each plaintiff had agreed to. *Id.* at 340. And Samsung had that information too, because plaintiffs provided the model and serial numbers "necessary to determine with accuracy whether plaintiffs agreed to arbitrate their claims." *Id.* Nevertheless, Samsung litigated for over two years before moving to compel arbitration. *See id.* at 337. Therefore, the Court concluded that Samsung "had the requisite information" and "should have known *definitively* that plaintiffs had agreed to arbitrate in this case" in November 2018; Samsung nevertheless waited until May 2020 to move to compel arbitration. *Id.* at 341 & n.29 (emphasis added).

Equifax's diligence stands in stark contrast to the defendant's behavior in *White*. First, rather than ignore evidence of arbitrability "from the outset," *id.* at 340, Equifax began investigating the arbitrability of Plaintiffs' claims two days after the complaint was filed, JA760. Through its investigation, Equifax learned that Plaintiffs had *not* entered into arbitration agreements, and that each had purchased only one or two verifications through the pay-as-you-go portal. *See* JA532. Plaintiffs therefore fit the profile of the typical pay-

31

as-you-go customer who makes a handful of sporadic purchases before their account is deactivated. *See* JA760.

Thus, unlike *White*, Equifax was not on notice of existing Agreements with Plaintiffs. *See White*, 61 F.4th at 340-41. To the contrary, Equifax knew for a fact at the beginning of litigation that Plaintiffs' claims were *not arbitrable* and were *unlikely to become arbitrable*. *See* JA760. Although each Plaintiff eventually made additional purchases, First Financial did so seven months after Equifax updated its Membership Agreement to include an arbitration requirement, while it took Greystone ten months. JA529. Given Plaintiffs' purchase history and profile—and especially considering the tens of millions of other verification requests that Equifax processed in the meantime—Equifax's discovery of the Agreements only four months after First Financial (and a month and a half after Greystone) initiated a new purchase is entirely reasonable.

The district court never conducted this required analysis; if it had, it could not have found that Equifax waived its arbitration rights.

2. The closest the district court got to a "knew" or "should have known" analysis was a passing remark in a footnote suggesting that "diligent record-keeping by Equifax[] would have revealed the existence of the

32

agreements." *See* JA23. But the district court provided no support for this conclusion, and there is none. There is no evidence that Equifax's record keeping fell short, and the district court provided no explanation of what a more diligent process would entail. Equifax processes millions of transactions from thousands of verifiers. JA759. It cannot be the case that, in order to preserve its rights, Equifax was required to constantly sift through transaction data on the off chance that Plaintiffs might have initiated an unusual one-off purchase that included an agreement to arbitrate. In fact, "[i]t would be *unreasonable* to expect" a large corporate defendant "to comb through voluminous records … to determine whether [a] Plaintiff might possibly have had other" agreements that were not identified at the outset of litigation. *Cf. Goza v. Multi-Purpose Civic Ctr. Facilities Bd.*, 2014 WL 3672128, at *7 (W.D. Ark. July 23, 2014) (emphasis added).[3]

---

[3] The fact that Equifax was not constantly monitoring Plaintiffs' online activities to determine whether they had purchased new services also undermines the district court's accusation that Equifax was somehow lying in wait for Plaintiffs to agree to arbitration. As explained below, *infra* p.51, there is no evidence that Equifax's decision to update its Membership Agreement to include the Arbitration Provision was driven by litigation tactics rather than routine business decisionmaking.

Automatically imputing Equifax with knowledge of the Agreements from the moment they were entered is impermissible for the same reasons. *Contra* JA25. That collapses the entire "knew" or "should have known" inquiry into a single determination of when the Agreements were formed. There would have been no need for *White*'s context-driven analysis about the information provided to Samsung during the litigation and its corresponding investigative efforts if a large corporate defendant is automatically credited with knowledge of a standard-form agreement from the moment a customer accepts it. *See White*, 61 F.4th at 340-41.[4]

More fundamentally, even if Equifax "maybe could have discovered the Arbitration Agreement earlier by speculative steps," at worst that might demonstrate ordinary negligence. *See Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 32 (E.D.N.Y. 2023), *aff'd*, 2024 WL 3643269 (E.D.N.Y. Aug. 2, 2024). But negligence "alone is insufficient for a finding of *waiver*," which

---

[4] Contrary to the analysis in *White* and the fact the waiver standard in federal court is a "federal procedural rule[]," *see Morgan*, 596 U.S. at 417, the district court improperly looked to Missouri state courts, suggesting that merely drafting an agreement imputes knowledge of that agreement to a defendant. *See* JA24 (citing *Lopez*, 656 S.W.3d at 328; *Housley v. Autohaus, L.L.C.*, 711 S.W.3d 554, 558 (Mo. Ct. App. 2025)). Even if precedential (they are not), those decisions indicate that knowledge of an arbitration agreement turns on the specific facts of each case.

is the *intentional* relinquishment of a known right. *Id.* (emphasis added) (collecting cases).

3. Even if the waiver clock started the moment Plaintiffs initiated the Agreements, Equifax's conduct was consistent with an intention to arbitrate. A finding of waiver cannot stand unless a party's conduct "evince[s] a preference for litigation over arbitration." *Valli*, 162 F.4th at 413 (citation omitted). Equifax's participation in the early stages of discovery cannot support that inference, particularly when it immediately moved to compel upon learning of the Agreements.

Consider the state of the proceedings when Equifax filed its motion: Fact discovery was just beginning. While Equifax had started producing documents, Plaintiffs had not made a single production.[5] No depositions had been noticed or taken. JA605. Expert discovery was still a year away. JA438-39. And summary judgment, class certification, and *Daubert* motions were due months after that. JA438-39. In other words, Equifax moved to compel arbitration near the very start of discovery, only about four months after First

---

[5] Plaintiffs rushed to make their first production of documents shortly after Equifax informed them that it intended to compel arbitration. JA605. The production totaled sixty pages. JA605.

Financial agreed to arbitrate and a mere month and a half after Greystone entered its Agreement. JA523; JA531-32. Courts in this circuit have held that a defendant does not "intentionally relinquish its right to arbitrate" merely by "engag[ing] in the early stages of pre-trial discovery." *See, e.g.*, *Smith*, 2023 WL 6057377, at \*5; *Jean-Baptiste v. Post Com. Real Est. LLC*, 2023 WL 5309902, at \*5-6 (E.D. Pa. Aug. 17, 2023). That conclusion should hold especially true in the context of a "long" and "complex" antitrust class action such as this, JA27, where Equifax moved to preserve its rights while the case was still in its infancy.

This Court's recent decision in *Valli* also rejects the district court's overzealous view of waiver. In that case, after some putative class members had agreed to arbitrate, the defendant (1) moved to dismiss on the merits and (2) participated in discovery and mediation. *Valli*, 162 F.4th at 411. Nonetheless, the Court found that early-litigation conduct did "not 'evince a preference for litigation over arbitration.'" *Id.* at 413 (quoting *White*, 61 F.4th at 340).

Equifax's conduct was even more arbitration-favoring than the defendant in *Valli*. Whereas the defendant in *Valli* sought to dismiss the case on the merits four months after it had actual and certain knowledge that some

class members had signed arbitration agreements (*i.e.*, the waiver clock started ticking), *see id.* at 401, 411, Equifax filed no substantive motions at all after Plaintiffs entered their Agreements. If a four-month gap that includes a bid to end the case does not evince an intent to abandon arbitration rights, *see id.* at 411, a four-month gap in the early stages of discovery in the "long" and "complex" case here doesn't either.

**B.      The District Court Erred When It Found That Arbitration Rights Can Be Waived Before They Exist**

Instead of applying this Court's "knew" or "should have known" test, the district court evaluated Equifax's conduct from the moment it updated the Membership Agreement—more than six months before either Plaintiff agreed to arbitrate its claims, *see* JA24; JA529; JA531-32—and held that a defendant can waive "future" contractual rights through litigation conduct. *See* JA21. In so doing, the court imposed a novel rule that deviates from the fundamental principle that one cannot "waive a right 'in a situation in which no right existed.'" *Chassen*, 836 F.3d at 293 (quoting *Ackerberg v. Johnson*, 892 F.2d 1328, 1333 (8th Cir. 1989)). The FAA, longstanding waiver rules, and this Court's precedents all affirm that basic rule.

1.      The FAA's text clearly makes enforceable a "written … contract" to arbitrate.  9 U.S.C. § 2; *see also id.* §§ 3-4 (governing arbitration

37

"agreement[s]").  In recognition of the FAA's clear import, the Supreme Court has repeatedly recognized that arbitration rights are "a matter of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010); *accord Lamps Plus*, 587 U.S. at 184.  In *AT&T Mobility LLC v. Concepcion*, the Court explained that the "principal purpose of the FAA is to ensure that private arbitration agreements are enforced according to their terms."  563 U.S. 333, 344 (2011) (cleaned up).

Because the right to arbitrate is treated like any other contractual right, *see Morgan*, 596 U.S. at 418, it can only be waived under the traditional standards for waiver.  And it is blackletter law that a contract right cannot be waived before it is created.  To determine if a right is waived, courts look to the actions of the party who "held" a "*known* right" to determine whether they intentionally "abandoned" or "relinquished" it.  *White*, 61 F.4th at 339 (emphasis added).  And courts explain that "intentional relinquishment" results in the "loss" of "rights."  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (criminal procedure context).  Because a party obviously cannot "relinquish," "abandon," or "lose" a right it does not possess, it cannot waive an unpossessed right either.

This Court's opinion in *Chassen* confirms the point: "A waived claim or defense is one that a party has knowingly and intelligently relinquished. How, then, can a party waive a right in a situation in which no right existed? The answer is: it cannot." 836 F.3d at 293 (cleaned up). Simply put, it is "legally anomalous"—if not incoherent—to find waiver before "a contract has been made." 13 Williston on Contracts § 39:19 (4th ed.).

2. The district court made little attempt to explain how its waiver holding was conceptually coherent or consistent with *Chassen*. Instead, the court rested entirely on its (over)reading of this Court's decision in *Valli*. *Valli* considered whether the futility doctrine excused a defendant's failure to notify the court of its intention to compel unnamed class members to arbitrate their claims. *See Valli*, 162 F.4th at 406. Specifically, the defendant argued that moving to compel arbitration was futile until after class certification. *See id.* The court rejected that argument and held "that when enforceability of a right to arbitration hinges on the occurrence of a foreseeable procedural event," the "right-holder" must give "reasonably prompt record notice" that it intends to exercise its rights "once the event occurs." *Id.* at 410. The district court interpreted *Valli* to mean that to "preserve future arbitration rights," *see*

39

JA21, Equifax needed to make its intent to arbitrate clear even before Plaintiffs agreed to arbitration.

Contrary to the district court's conclusion, however, *Valli* affirms that only existing arbitration rights can be waived. *Valli* identified the "contractual source" of arbitration rights, called a party with an arbitration agreement a "right-holder," and alluded to a party's "*existing* right to arbitrate." *Valli*, 162 F.4th at 408, 410-11 (emphasis added). And there was no question in *Valli* that the defendant possessed existing, contractual arbitration rights. The only thing preventing the defendant from enforcing its existing arbitration rights was a "foreseeable procedural" event (*i.e.*, class certification). *See id* at 410. So *Valli* reasonably started the waiver clock when the defendant rolled out its arbitration provision because, at that point, the defendant held existing arbitration agreements with "unnamed class members" who had already accepted the provision. *See id*. at 411.

Here, by contrast, Equifax could not have enforced its Arbitration Provision against Plaintiffs from the moment it incorporated that term, because Plaintiffs had not yet agreed to it (and may never have agreed to it). No procedural event, foreseeable or not, would have allowed Equifax to move to compel arbitration against parties who had never agreed to arbitrate. For

the same reason, there was no right that Equifax could abandon, relinquish, or act inconsistently with until the named Plaintiffs agreed to arbitrate. The district court's contrary holding penalizes Equifax for failing to assert its intention to arbitrate its claims against a party who had not agreed to arbitration.

## III. The District Court Improperly Enjoined Enforcement of a Bilateral, Voluntary Membership Agreement Under FRCP 23(d)

The district court's Rule 23 order was premised upon its holding that Equifax waived the right to arbitration. Because that holding was erroneous and should be reversed, the Rule 23 order should necessarily be vacated as well. But even were the Court to hold that Equifax waived its right to arbitrate against Plaintiffs, the Court should nevertheless hold that the district court abused its discretion by enjoining the Agreements under Fed. R. Civ. P. 23(d).

As a threshold matter, Rule 23(d) does not authorize district courts to void otherwise lawful arbitration agreements. That rule lets district courts streamline proceedings, regulate communications between the parties, and "deal with similar *procedural* matters" (emphasis added). It does not silently grant district courts a previously unheralded power to vitiate private contracts on grounds that do not otherwise "exist at law or in equity." 9 U.S.C. § 2.

41

Even if a district court may enjoin the enforcement of an arbitration agreement under Rule 23(d) as a corrective of last resort, the remedy is typically reserved for cases of "blatant misconduct" where defendants coerce or mislead vulnerable plaintiffs with an evident intent to undermine the class action. *See In re Sch. Asbestos Litig.*, 842 F.2d 671, 682-83 (3d Cir. 1988). That is not this case. Nothing about the circumstances here was coercive or misleading; the record certainly did not justify protective intervention by the district court.

At the very least, the district court's injunction was overbroad. Rule 23(d) relief is stiff medicine, and any order must be "the narrowest possible relief which would protect the respective parties." *Gorgonzola v. Dir. U.S. Off. of Pers. Mgmt.*, 2023 WL 1478999, at *6 (3d Cir. Feb. 2, 2023) (cleaned up). But the district court issued a sweeping remedy, enjoining the enforcement of all of Equifax's Agreements under the updated Membership Agreement (as formulated) and allowing potential future agreements only with curative notice and revised terms. Leaping first to an across-the-board invalidation of fully consensual agreements made under lawfully promulgated terms needlessly trammeled the contract rights of Equifax and those absent class members who may prefer to arbitrate.

## A. Rule 23(d) Does Not Empower District Courts To Void Private Contracts

Rule 23(d) is a residual grant of procedural authority: It permits district courts, while "conducting" a class action, to "issue orders" that "determine the course of proceedings," "require … appropriate notice" of class members' rights, "impose conditions on the representative parties," "require that the pleadings be amended," or "deal with similar *procedural* matters." Fed. R. Civ. P. 23(d)(1) (emphasis added). The final clause is important: By granting authority over "*similar* procedural matters," the text indicates that the authority under Rule 23(d) is an authority to regulate the procedure of a class action. Consistent with the text, courts routinely invoke Rule 23(d) to regulate "communications" between a defendant and class members concerning the litigation. 3 Newberg and Rubenstein on Class Actions § 9:2 & n.10 (6th ed., Dec. 2025 update). But nothing in Rule 23(d) grants a court the power to enjoin the operation of the Membership Agreement, let alone on substantive grounds previously unknown at law, let alone as to thousands of entities that are not members of a class (because no class has been certified). Indeed, the district court did not quote a single word of the rule in concluding that Rule 23(d) allowed courts to enjoin the Agreements here. *See, e.g.*, JA32.

Other federal statutes make clear that Rule 23(d) cannot serve as a freestanding authority to enjoin private contracts—especially arbitration agreements. First and foremost, the FAA insists that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This expresses "a liberal federal policy favoring arbitration"; "courts *must* … enforce" arbitration agreements "according to their terms." *Concepcion*, 563 U.S. at 339 (emphasis added) (cleaned up). Of course, plaintiffs are always free to raise a defense available at law for the "revocation of any contract"—such as duress or unconscionability. *Id*; *see also* 9 U.S.C. § 2. But when those defenses *aren't* available, Rule 23(d) does not allow a court to void an arbitration agreement based on some vague sense of fairness to the litigants (or to thousands of parties not even before the court). That would open a backdoor method for *ad hoc* refusals to enforce arbitration agreements when the FAA leaves "no place for the exercise of discretion by a district court" in enforcing an otherwise lawful arbitration agreement. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

Reading Rule 23(d) to authorize injunctions against arbitration agreements would also violate the Rules Enabling Act. The Federal Rules

44

may not "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). To be valid, a federal rule must "regulate[] only the *process* for enforcing … rights," it may not "alter[] the rights themselves … or the rules of decision by which the court adjudicate[s]" them. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407-08 (2010) (plurality opinion) (emphasis added). Yet the district court interpreted Rule 23(d) to authorize district courts to directly abrogate private contractual rights on *substantive* grounds that do not generally apply to any contract, and to do so in a manner that deprives one side, but not the other, of the benefit of its bargain. That is precisely what the Rules Enabling Act forbids.

The district court barely defended its view that Rule 23(d) independently authorized it to "enjoin the enforcement of the updated Membership Agreement." JA27. It assumed that its administrative authority encompassed any order "relating to the fair and effective administration of class actions." *See* JA27-28. But that goes well beyond Rule 23(d)'s text. Rule 23(d)(1)(B) permits courts "to require … giving appropriate notice to some or all class members" in order to "protect class members and fairly conduct the action." That second phrase is simply the rationale for the explicit textual authority to compel notice. It is not an omnibus authority to issue any

45

conceivable order with the purpose of protecting putative class members. Especially where, as here, Congress has conferred a carefully delineated authority over "procedural matters," courts cannot lightly infer (let alone assume without any textual basis) that Congress intended to grant each district court new remedial powers.

The district courts that have invalidated arbitration agreements under Rule 23(d) have done so without even attempting to root that power in the text of the rule. *See, e.g.*, *Jimenez v. Menzies Aviation Inc*, 2015 WL 4914727, at *5-6 (N.D. Cal. Aug. 17, 2015). The district court here quoted without elaboration a Ninth Circuit case which insisted that Rule 23(d) must "authorize[] a district court to refuse to enforce an arbitration agreement" because "there would be no point to FRCP 23(d)'s broad authority to oversee class action communications if the authority stopped when a party's misleading communications with class members resulted in an agreement before the district court intervened." JA32 (quoting *Avery v. TEKsystems, Inc.*, 165 F.4th 1219, 1228-29 (9th Cir. 2026)). But the *Avery* decision ignores that in the context of a remedial statute, a lesser power does not necessarily include the greater. *Cf. AMG Cap. Mgm't, LLC v. FTC*, 593 U.S. 67, 79-80 (2021). Just because courts may "limit[] communications between parties and

potential class members," *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981), does not mean a court can nullify legal rights that vested before the court placed limits on parties' conduct.

Of course, parties are not left without a remedy if arbitration is imposed through coercive communications. "[P]arties have the entire contractual toolbox available to them to seek to enforce or oppose an arbitration provision." *White*, 61 F.4th at 339. They could, for example, seek a declaration that the arbitration provision is procedurally or substantively unconscionable. *See, e.g.*, *OConner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 602-06 (S.D.N.Y. 2020) (invalidating mid-litigation arbitration agreement under unconscionability doctrine); *see also* 9 U.S.C. § 2. But the district court here conjured an even more expansive power supposedly hiding in Rule 23(d): the power to enjoin enforcement of an arbitration agreement based on perceived threat to the putative class action *even if* the agreement is otherwise enforceable at law. That sweeping assertion of authority has no grounding in the text of Rule 23(d) or this Court's precedents interpreting it.

### B. The District Court Abused Its Discretion Under Rule 23(d) by Voiding Voluntary and Bilateral Arbitration Agreements

Even if district courts had the authority to enjoin the enforcement of voluntary arbitration agreements under Rule 23(d), this would not be the

exceptional case that would warrant that extreme remedy. Rule 23(d) permits courts to issue procedural orders to prevent "abuse of the class action process." *In re Sch. Asbestos Litig.*, 842 F.2d at 680. To determine whether post-complaint actions are "abus[ive]," circuits look at the totality of the circumstances—with special focus on whether defendants engaged in coercive or deceptive behavior aimed at undermining the litigation—and "weigh[]" the "need for a limitation [against] the potential interference with the rights of the parties." *Id.* (cleaned up); *Avery*, 165 F.4th at 1231-33; *Fox v. Saginaw County*, 35 F.4th 1042, 1047 (6th Cir. 2022) (Thapar, J.).

In conducting that analysis, courts have granted Rule 23(d) relief when (1) putative class members are "vulnerab[le]" relative to the defendants; (2) the defendant "targeted putative class members in a purposeful effort to narrow the class"; (3) arbitration was "unilaterally imposed on the putative class"; (4) there is "evidence of actual coercion or conditions conducive to coercion"; and (5) there is "evidence of misleading conduct, language, or omissions." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 255 (S.D.N.Y. 2020). So, for example, courts in this circuit have found post-complaint arbitration agreements to be abusive when defendants purport to impose them unilaterally, without class members' consent; when the

agreements mislead or trick class members about the nature of the rights they are giving up; and when defendants target vulnerable members of a putative class (or all of the above). *See, e.g.*, *Williams v. Securitas Sec. Servs. USA, Inc.*, 2011 WL 2713741, at *2-3 (E.D. Pa. July 13, 2011).

This case involves none of that foul play. Equifax revised its Membership Agreement in the ordinary course of business—a change applicable to less than 1% of the proposed class. Equifax offered its revised terms to all who wanted to engage its pay-as-you-go verification services— services for which there is a free and robust market (as evidenced by Plaintiffs' only sporadic use of Equifax's services over the years). And *Plaintiffs* were the ones who sought out and initiated a transaction with Equifax, signing a contract in the process that prominently and unambiguously included an Arbitration Provision.

### 1.    **Plaintiffs Are Sophisticated and Counseled Parties**

At the outset, Plaintiffs are not "particularly vulnerable to coercion," *Chen-Oster*, 449 F. Supp. 3d at 264—they are mortgage companies. Courts have concluded that plaintiffs like "financial services professionals," *id.* at 264, "lawyer[s]," and "information technology professional[s]," are not the kind of vulnerable parties that need special protection under Rule 23(d), *Story v.*

*Heartland Payment Sys., LLC*, 461 F. Supp. 3d 1216, 1223 (M.D. Fla. 2020). Similarly here, Greystone and First Financial are in the business of brokering home loans, including by preparing and reviewing contracts. And both Plaintiffs have been represented by experienced counsel throughout this litigation. In fact, a principal at First Financial admitted he tried to log into his Equifax web portal account because his counsel asked him to collect documents for this litigation. JA676. And the president of Greystone admitted that, on at least one prior occasion, he consulted with his attorneys about a "pop-up" on Equifax's web portal. JA683. The putative class of Equifax customers, meanwhile, includes some of the most sophisticated entities in the country, like Morgan Stanley, U.S. Bank, and DHI Mortgage Company. JA777.

That is a far cry from cases where courts have intervened to protect disadvantaged class members. For example, courts have found persons to be vulnerable when they were immigrants "with limited English proficiency and little or no formal education." *Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 511, 518 (N.D. Cal. 2010); *accord O'Connor v. Uber Techs., Inc.*, 2013 WL 6407583, at *6 (N.D. Cal. Dec. 6, 2013). Courts have likewise found that "hourly workers" with "no more than a high school education" are

especially susceptible to coercive communications. *Monroe v. Stake Ctr. Locating, LLC*, 2025 WL 941310, at *4 (E.D. Va. Mar. 27, 2025); *accord Salazar v. Driver Provider Phx. LLC*, 532 F. Supp. 3d 832, 837 (D. Ariz. 2021). The putative class members here, by contrast, "were well-positioned to understand the implications of [the] contracts presented to them." *Chen-Oster*, 449 F. Supp. 3d at 264. That is especially true of the named Plaintiffs—mortgage companies whose business is to *regularly deal in complex contracts*. Their "sophistication" as "financial services professionals … is a factor that far distinguishes this case from those where courts deemed it necessary to take action to prevent or cure likely confusion among low-wage or less-educated workers." *Id.*

### 2. Equifax Did Not Purposefully Target Plaintiffs

Plaintiffs introduced no evidence that Equifax purposely "targeted" them or putative class members in order to "curtail[] th[e] litigation." *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 919 (11th Cir. 2014). To the contrary, the record demonstrates that Equifax's decision to roll out a renewed Membership Agreement for its pay-as-you-go E-Commerce Portal was not targeted at this class action. Three facts make that especially clear: (1) Equifax only updated the terms of service for a small fraction of the

51

proposed class; (2) Equifax had no reason to expect Plaintiffs would use the E-Commerce Portal again and accept the new Membership Agreement (and only discovered they had because of a discovery request from Plaintiffs); and (3) Plaintiffs—not Equifax—sought out the transactions that led them to accept the Agreements.

*First*, Equifax only updated its terms of service for pay-as-you-go E-Commerce Portal users. But the bulk of Equifax's verification business is contract-based—indeed, it provides millions of verification requests pursuant to contracts, which include varying provisions for dispute resolution. JA774; JA759. Less than 1% of Equifax's verification business involves customers (like Plaintiffs) who use its pay-as-you-go E-Commerce Portal for sporadic and *ad hoc* requests. JA759. Of course, Plaintiffs purport to represent a class of purchasers that includes primarily entities that use contract-based verification services. But it cannot possibly be said that Equifax targeted the class by revising the Membership Agreement applicable to only a tiny fraction of the class.

Equifax's behavior thus stands in stark contrast to cases where the entire (or nearly the entire) class was targeted. For instance, in *In re Currency Conversion Fee Antitrust Litigation*, which Plaintiffs relied on

heavily below, the defendants targeted "most putative class members" with a new "binding arbitration agreement[,] … precluding them from bringing th[e] action." 224 F.R.D. 555, 569 (S.D.N.Y. 2004). Similarly, in *OConner*, a set of employees sued their employer for violations of state and federal labor law, and the employer responded by requiring *all* new and existing employees (including class members) to sign an arbitration agreement "as a condition of continued employment." 444 F. Supp. 3d at 598. And in *Billingsley*, the defendant rolled out a new dispute resolution policy "but only to putative collective action members." 560 F. App'x at 918. Here, however, Equifax's routine updates to the terms of *one* of its products neither tracked the class nor was likely to capture the named Plaintiffs.

*Second*, Equifax had little reason to suspect that named Plaintiffs would seek out verification services after it updated its Membership Agreement, so any suggestion that Equifax was "tactical[ly]" waiting to spring arbitration on Plaintiffs or on the court is a manifest fiction. *Contra* JA30-31. In the years prior to the start of this litigation, Plaintiffs had only purchased verification services from Equifax one or two times. *See* JA532. From Equifax's perspective, this is commonplace. Most E-Commerce Portal users purchase two or fewer verifications, and their accounts are eventually deactivated due

53

to inactivity. JA760. Plaintiffs' behavior was perfectly consistent with that pattern. And so Equifax had no reason to think that Plaintiffs would log in and purchase additional verifications after terms were updated in August 2024.

The district court nevertheless criticized Equifax for raising the existence of these Agreements after it learned of their existence. JA35-36. But that actually *proves* the lack of targeting. Rather than proactively seeking out Plaintiffs at the outset of litigation to undermine the class action, Equifax only entered into arbitration agreements with Plaintiffs ten and thirteen months later, and only because *Plaintiffs* voluntarily, and unexpectedly, initiated new transactions with Equifax. JA529; JA532. Indeed, it took a discovery request for Equifax to even look for and unearth its Agreements with Plaintiffs, at which point Equifax took steps to compel arbitration within forty-eight hours. JA528-29; JA606. As the Eleventh Circuit has recognized, there can hardly be impermissible targeting when a defendant's "central legal team … did not know that [plaintiff] had" entered into the agreement. *Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1272 (11th Cir. 2017).

Similarly, the district court implied some nefarious purpose behind Equifax's decision to update its Membership Agreement a few months after this class action was filed. JA30-31 & n.17. There was no legitimate basis for

54

that speculation.  Equifax, like other corporations, regularly updates its terms of service.  It revised the Agreements at issue at least two times in the last three years.  JA529-30.  Nor is there anything remarkable about Equifax's decision to include an arbitration provision.  Form arbitration agreements provide "enormous savings in transaction costs," *cf. Nw. Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 377 (7th Cir. 1990), and ensure that disputes are resolved at "lower costs" and with "greater efficiency and speed," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010).  Those efficiencies permit Equifax to continue providing low-cost services to low-volume customers (like Plaintiffs) without the threat of protracted litigations arising from individual purchases.

At most, it was foreseeable that some putative class members might sign the Agreement.  But nothing in Rule 23 prohibits a party from taking legitimate business action with possible (although still unknown) secondary effects.  Rule 23(d) gives courts power to curtail defendants from "foist[ing]" new and coercive communications that serve to destroy a class action.  *Chen-Oster*, 449 F. Supp. 3d at 266.  This is not that.

*Third*, and perhaps most importantly, Plaintiffs knowingly and voluntarily accepted the Agreements as part of transactions with Equifax that

*they initiated.* JA529-30. After using Equifax's verification services just once or twice in the years before filing suit, *see* JA532, principals at First Financial and Greystone sought out and purchased verification services almost a year later (and over a year later for First Financial), in March and June 2025. JA529. In doing so, they affirmatively consented to the new Agreements, which prominently included an arbitration provision. JA529-30.

The Eleventh Circuit's decision in *Waffle House* is instructive. There, the named plaintiff in a class action against Waffle House applied for a job at the company while the class action was pending. 866 F.3d at 1261. When he was hired, he signed an arbitration agreement as part of his onboarding. *Id.* at 1261-62. The Eleventh Circuit concluded the defendant's conduct was not coercive because "it was [plaintiff] who initiated the communication with the defendant by seeking employment." *Id.* at 1272. So there was "not the slimmest shred of evidence that the arbitration agreement was part of a purposeful attempt to communicate with putative class members," and "[n]othing" raised concerns "about unsupervised, unilateral communications with the plaintiff class." *Id.* (cleaned up). The same is true here.

### 3. Equifax Did Not Unilaterally Impose the Agreements

Moreover, the Agreements here were not unilaterally imposed. It weighs against any finding of coercion or abuse when class action plaintiffs are given the choice whether to "affirmatively agree" to "boldly stated" terms, *Story*, 461 F. Supp. 3d at 1224, and when those terms are "individually accepted," *Chen-Oster*, 449 F. Supp. 3d at 267. That is what happened here.

Again, Plaintiffs sought out verification services through Equifax while represented by counsel and with full knowledge that they were spearheading this litigation. *See supra* pp.9-11. Once they did so, they were shown an Agreement, which stated in the very first line that it "CONTAINS A BINDING ARBITRATION PROVISION." JA534. Each Plaintiff certified that they "reviewed and agree[d] to the above Terms and Conditions," and when presented with the options to "Agree & Continue" or "Disagree & Logout," both Plaintiffs clicked "Agree." JA529-30; JA551-552.

### 4. Plaintiffs Were Not Coerced

Nor did Equifax coerce Plaintiffs (or potential class members) into signing the Agreements. An "ongoing business relationship … alone is insufficient to warrant [Rule 23(d)] relief." *Garcia-Alvarez v. Fogo De Chao Churrascaria (Pittsburgh) LLC*, 2021 WL 5804289, at *4 (E.D. Tex. Dec. 7,

2021).  Instead, courts find coercion only where a defendant "overpower[ed]" the plaintiff's "free will or business judgment," *Jenifer v. Del. Solid Waste Auth.*, 1999 WL 117762, at *5 (D. Del. Feb. 25, 1999), through, for example, threats or other high-pressure tactics.  *See, e.g.*, *Billingsley*, 560 F. App'x at 918-19 (two-on-one, closed-door "blitzkrieg" between HR representatives and putative class members).  Here, by contrast, Plaintiffs initiated the transactions leading to the Membership Agreement.  They affirmatively chose to accept the terms and conditions to obtain Equifax's services.  And the terms and conditions were clear and prominent.

The district court posited two reasons why Equifax's behavior was coercive in its view, but neither withstands scrutiny.  First, the court thought this case was analogous to the Ninth Circuit's decision in *Avery v. TEKsystems, Inc.*, 165 F.4th 1219 (9th Cir. 2026).  JA32.  There, the plaintiffs sued their employers for violations of wage and hour laws.  *Avery*, 165 F.4th at 1221-22.  At the class certification stage, the defendant tried to implement a new arbitration agreement and class action waiver.  *Id.* at 1222.  To push that agreement, it sent employees multiple emails that disparaged class actions and gave inconsistent instructions about how to opt out of the arbitration agreement, and threatened jobs if employees did not sign the agreements.  *Id.*

58

at 1231-32.  Here, by contrast, Equifax does not employ Plaintiffs or class members, cannot threaten or pressure them, and did not send them confusing communications.

Second and relatedly, the district court hypothesized that many people are dependent on Equifax for their employment and income verification services.  JA33-34.  In other words, the district court effectively assumed the truth of what Plaintiffs "alleged"—that Equifax has market power to "limit consumer choice"—and used that as a basis to infer that putative class members were coerced into signing arbitration agreements.  JA34-35.  But there is *zero* evidence in the record suggesting that Equifax has this monopoly power.  The only evidence the court cited to support its concern was the allegations in Plaintiffs' *complaint* and the conclusory declarations of Plaintiffs.  Moreover, the complaint itself acknowledges that businesses can verify income and employment manually without independent verification services at all.  JA60.  Plaintiffs' own history proves the point: They had ordered only three verifications from Equifax in recent years, undermining any claim that businesses that need verification services cannot survive without Equifax's pay-as-you-go portal.  The president of Greystone even had

the website for one of Equifax's verification-service competitors pinned to his Internet browser's bookmarks bar. JA654.

More fundamentally, even if it were theoretically possible that a class member had circumstantial pressures to use Equifax's verification services, "[i]t is not enough that a potentially coercive situation exists"; the court must also make "specific findings" that Equifax has actually coerced, or threatened to coerce, Plaintiffs or other putative class members. *Burrell v. Crown Cent. Petroleum, Inc.*, 176 F.R.D. 239, 244 (E.D. Tex. 1997); *cf. Gulf Oil*, 452 U.S. at 101-02. The district court made no such findings here, nor could it.

### 5. The Agreements Conspicuously Included an Unambiguous Arbitration Provision

Lastly, the Agreements are not misleading in any respect because they clearly identify the existence and scope of the arbitration provisions, and they were not presented in a confusing manner. At the top and bottom of each Agreement, in all capital letters, the Agreements shouted that there was an arbitration provision. *Supra* p.11. And that provision expressly required arbitration for all past and pending claims. *Supra* p.11. Courts have consistently refused to enjoin arbitration agreements where, as here, they

"clearly set forth that the [plaintiffs] … would have to arbitrate any and all claims." *Chen-Oster*, 449 F. Supp. 3d at 269.

The district court's concern that class members would be confused by the presentation of the Agreement lacks any basis. JA31. The court was concerned that class members were presented with two documents, only the first of which contained an arbitration clause. JA31. But it is unremarkable that Equifax made acceptance of the terms (including the arbitration provision) a precondition of its web-portal services. Any internet user knows that is commonplace.

The district court was also concerned that even if the existence and scope of the Arbitration Provision were clear, the Agreements made no explicit mention of the class action or putative class members' rights. JA31. For starters, it is strange (if not perverse) for Plaintiffs to claim that a contract was misleading for failing to mention a lawsuit that *they* had initiated. Premising Rule 23(d) relief on that fact alone puts defendants in an impossible dilemma: If they specifically mention litigation in the arbitration agreement, they will be accused of targeting class members. But if they don't mention the litigation—and instead provide the utmost clarity about the scope of the arbitration agreement—they will be accused of hiding the ball. Regardless,

any "concern" that the Agreements did not mention the ongoing class action should be "tempered by the fact that the Arbitration Agreement clearly advised that [plaintiffs] who signed the agreement" agreed to arbitrate any claims, past and present, that they had against Equifax. *Cf. Hegazy v. Halal Guys, Inc.*, 2023 WL 8924092, at *6 (S.D.N.Y. Dec. 27, 2023).

## C.     The District Court's Rule 23(d) Order Was Not Tailored

"Any remedy under Rule 23(d) should be restricted to the minimum necessary to correct the effects of improper conduct under Rule 23." *NFL Players' Concussion Inj. Litig.*, 923 F.3d 96, 109 (3d Cir. 2019) (cleaned up). Here, the district court "enjoin[ed] the enforcement of [Equifax's] updated Membership Agreement under its present form," ordered "Equifax to make a curative notice to those who have already accepted its terms," and instructed "Equifax to revise its arbitration provision to appropriately apprise potential class members of this litigation." JA27-28. The sweep of those remedies is startling: It deprived Equifax of the benefit of its bargain with thousands of parties not before the court, all while allowing those parties to enjoy the fruits of their contracts without the obligation to arbitrate disputes. Even if the district court's conclusions about Equifax's supposed "gamesmanship" were well-founded, JA35, they cannot support the remedies the court imposed.

To the extent the district court was concerned that the Agreements were confusing or failed to inform putative class members of the litigation, that problem could be remedied easily—and much more narrowly—by a curative notice providing affected class members "the opportunity to opt out of arbitration and remain in the class litigation." *Chen-Oster*, 449 F. Supp. 3d at 272. That remedy "avoids outright invalidating the arbitration provisions" and instead "provides individual Class Members with a choice" that "should have been theirs to make at an earlier time." *Id.* A curative notice would have the added benefit of minimizing any Rules Enabling Act concerns because it does not "invalidate … arbitration provisions" by default. *Id.* at 272-73. Unsurprisingly, then, other courts have viewed this as the appropriate remedy, even when defendants' mid-litigation arbitration agreements are found to be coercive or misleading. *See, e.g.*, *Ralph Oldsmobile, Inc. v. Gen. Motors Corp.*, 2001 WL 1035132, at *7 (S.D.N.Y. Sept. 7, 2001) (giving class members notice and the option to "have th[eir] release voided").

The district court never explained why it chose to invalidate all the "arbitration agreements that Equifax has reached under the present terms" rather than simply instituting an opt-out procedure. JA35. It merely accused Equifax of "subvert[ing] … the federal forum" and cited its supposedly "broad

63

authority" under Rule 23(d). JA36. But those (erroneous) assertions do not establish that the district court's chosen remedy was the narrowest necessary to correct Equifax's supposed misbehavior. And it plainly was not—to the extent any remedy was appropriate, an opt-out period would protect any putative class members who believed they were misled or coerced by Equifax's Agreements without needlessly depriving Equifax of the benefit of its contracts with those counterparties who instead acted with their eyes open.

## CONCLUSION

The district court decided a waiver question that the parties contracted for an arbitrator to decide. Having seized the wheel, the court upended blackletter waiver principles by holding that Equifax waived its right to arbitrate before that right existed and before Equifax knew or should have known about it. And the court ordered relief that Rule 23(d) does not authorize. Each of those conclusions was error. This Court should reverse the district court's denial of Equifax's motion to compel arbitration, vacate the injunction, and remand with instructions to compel arbitration.

Respectfully submitted,

*/s/ Charles L. McCloud*
EDWARD J. BENNETT
JONATHAN B. PITT
CHARLES L. McCLOUD
  *Counsel of Record*

64

WILLIAMS & CONNOLLY LLP
*680 Maine Avenue SW*
*Washington, DC 20024*
*(202) 434-5000*
*lmccloud@wc.com*

May 18, 2026

65

# COMBINED CERTIFICATIONS

1. **Bar Membership**:  I certify that I am a member of this Court's Bar.

2. **Word Count, Typeface, and Type Style:**  I certify that this brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(a)(7)(B) and 32(f) because the brief was produced using Microsoft Word and it contains 12,962 words, excluding those portions excluded by Rule 32(a)(7)(B)(iii).  I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and type style requirements of Rule 32(a)(6) because it has been prepared in the proportionally spaced typeface, CenturyExpdBT, size 14.

3. **Service.**  I certify that on this date I am causing this brief to be filed electronically via the Court's CM/ECF system.  All participants in both consolidated cases are registered CM/ECF users and service will be accomplished using the CM/ECF system.

4. **Paper copies.**  I certify that the text of the electronic brief filed via ECF is identical to the text of the paper copies that will be delivered to the Court.

5. **Virus check.**  I certify that I have caused a virus check to be performed using the latest version of Symantec Endpoint Protection, Version 14.

*/s/ Charles L. McCloud*
CHARLES L. MCCLOUD

May 18, 2026

**STATUTORY ADDENDUM**

# TABLE OF CONTENTS

9 U.S.C. § 2 ..................................................................................1a

Federal Rule of Civil Procedure 23(d) ...............................................2a

**9 U.S.C. § 2**

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

**Federal Rule of Civil Procedure 23(d)**

(d) CONDUCTING THE ACTION.

(1) *In General.* In conducting an action under this rule, the court may issue orders that:

(A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

(B) require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of:

(i) any step in the action;

(ii) the proposed extent of the judgment; or

(iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

(C) impose conditions on the representative parties or on intervenors;

(D) require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

(E) deal with similar procedural matters.

(2) *Combining and Amending Orders.* An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.